218 So.2d 913 (1969)
Mrs. Dixie HARNEY
v.
Charles L. KOUNTZ, Jr. and Lumbermens Mutual Casualty Company.
No. 3250.
Court of Appeal of Louisiana, Fourth Circuit.
February 3, 1969.
Rehearing Denied March 3, 1969.
*914 Melvin J. Duran, New Orleans, for plaintiff-appellee.
Hammett, Leake & Hammett, Donald Hammett, New Orleans, for defendants-appellants.
Before SAMUEL, HALL and JOHNSON, JJ.
SAMUEL, Judge.
This is a suit for personal injuries incurred in a three-car collision. Plaintiff was the owner-driver of one of the automobiles involved. The two defendants are the owner-driver of the defendant vehicle and his liability insurer. The accident occurred on October 20, 1965 in the City of New Orleans. The plaintiff automobile was stopped in obedience to a red traffic signal. Another car also was stopped for that signal behind plaintiff. The defendant automobile failed to stop, struck the rear of the second car and propelled it into the rear of the plaintiff automobile.
Judgment in the lower court was rendered in favor of the plaintiff in the sum of $10,000 for personal injuries and $2,079.84 for special damages. The defendants have appealed. In this court they admit negligence on the part of the defendant driver but contend that both awards are excessive. In connection with their contentions defendants also argue that plaintiff's failure to call two of her examining physicians gives rise to a presumption their testimony would have been unfavorable to her and that, insofar as the extent of plaintiff's injuries are concerned, the trial court failed to consider the absence of physical damage to the plaintiff vehicle.
The record contains the testimony of ten witnesses: the plaintiff (a school teacher); the individual defendant; two orthopedic specialists, Dr. Ray J. Haddad, the treating physician who testified on behalf of plaintiff, and Dr. Hyman R. Soboloff, a defendant expert; and six lay witnesses, Mrs. Caroline Scott, plaintiff's aunt and a passenger in her vehicle at the time of the accident, Nicholas Tadin, driver of the vehicle which struck plaintiff's car when hit by the defendant automobile, Gerald Lowe, the investigating police officer, Mrs. Emily Bickham, principal of the school where plaintiff teaches, Mrs. Laura Barnett, a *915 teacher in that school and Alfred B. Hebeisen, Director of Personnel for the Orleans Parish School Board.
The testimony of plaintiff, the doctors, Mrs. Bickham, Mrs. Barnett and Mrs. Scott is principally concerned with plaintiff's personal injuries, while Mr. Hebeisen's testimony is concerned mainly with plaintiff's school attendance records. Testimony of the other witnesses relates to the occurrence of the accident, the extent of the damage to plaintiff's vehicle, and plaintiff's physical condition immediately after the accident.
Relative to personal injuries, plaintiff testified as follows:
After the accident she drove to work, not realizing she had been injured. At school she began to feel uncomfortably warm and experienced increasing headache and pain in the neck area. She telephoned her family doctor who recommended Dr. Haddad, an orthopedic specialist. Dr. Haddad saw her that afternoon. He prescribed physical therapy, which was started the next morning, the use of a traction bar at home and application of dry heat. Over the course of twenty-five months from the date of the accident to the time of trial she had received 75 physiotherapy treatments, saw the doctor on more than 17 occasions, was x-rayed 4 times, and used the traction bar and dry heat at home daily. During that time she had used three different drugs prescribed by the doctor to ease her pain. As a result of the accident she was unable to work from October 21 to December 13, 1965, a period of approximately six weeks. While the pain in her neck has reduced in intensity it has never completely left. It is greatest at the top of the spinal column and pain radiates down her neck and across her shoulders. It is more severe with changes of the weather. The residual headaches and constant pain at the top of the spinal column cause her to be less cheerful and a less productive person than she was prior to the accident. She does not have the ability to move her head as well as she was able to previously.
Dr. Haddad, the treating physician testified: He first saw plaintiff at the request of her family physician on October 20, 1965 and last saw her on November 22, 1967. There had been no interruption in treatment since the accident occurred twenty-five months previously. He saw her on 17 occasions and she received approximately 75 physiotherapy treatments over that period of time. At the initial examination plaintiff had a decreased range of motion in the neck actively. Passively she had almost full range of motion. She experienced pain on full extension and flexion and exhibited bilateral paravertebral muscle spasms, particularly on the right side. Plaintiff was tender at the base of the occiput and in the interior aspect of the neck and in the area of the strap muscles. She was placed on supportive physiotherapy and medication for pain and relief of muscle spasms.
X-rays of the cervical spine were within normal limits except for preexisting arthritis, particularly on the body of C-6. Subsequent x-rays, taken during the course of treatment, revealed no change from the first x-ray. The doctor found objective evidence of plaintiff's complaints on the initial visit in muscle spasms present on both sides of her neck and on the mid-portion of the spinal column, and continued muscle spasms for a period of three months thereafter. Mrs. Harney complained to him of headaches and severe pain in the occipital area over a long period of time and gradually responded to therapy, traction, and heat which she was instructed to use daily. The doctor diagnosed her injuries as a moderate to severe cervical strain. He attributed her unusually protracted recovery to degenerative changes in the neck which existed prior to the injury.
Since plaintiff's recovery was protracted during the first year following the accident, this doctor recommended a neurological examination which was performed by Dr. Richardson. The neurosurgeon advised Dr. Haddad that inasmuch as there was no evidence of neurological defects, he considered *916 plaintiff's complaints were psychoneurotic. Inasmuch as the x-rays showed no change from the initial x-rays of October, 1965 Dr. Haddad felt the two year period was excessively long for her recovery. Marked improvement was noted after a year and on each of the following four occasions she was examined. With continued use of home traction the doctor anticipated her symptoms should subside within three or four months from the date of trial (December 5, 1967). If she had further symptoms beyond this period they would be attributable to degenerative arthritis unconnected with the accident. Although plaintiff's complaints were prolonged and protracted over a two-year period Dr. Haddad did not feel she was a malingerer.
Dr. Hyman Soboloff saw plaintiff at defendants' request on one occasion on February 27, 1967, approximately one and one-quarter years from the date of the accident. He took her history and made an orthopedic examination of the neck and upper extremities. She complained of neck pains and headaches. When asked to move her head and neck she did so as far as she felt she could without incurring soreness and pain, restricting further motion. The doctor did not force her to move beyond that limit. However, inasmuch as he found no muscle spasm or tightness in the ranges of restriction, he was of the opinion that such restriction was voluntary on her part. He found no restriction of the shoulder or arm motions, no loss of muscular function in either upper extremity, and no loss of shoulder girdle function.
Dr. Soboloff found no objective evidence to substantiate plaintiff's complaints and felt they were persistent due to the voluntary restriction causing the development of a fibrosis and shortening of the muscles. In his opinion if she continued such restriction, muscle shortening would result within the next six months. He also felt that if a patient fails to improve from this type of neck injury over a period of three, four, or six months he would look to other reasons for the complaints to the point of a neurosurgical and additional orthopedic opinions. X-rays showed sclerosis in the superior pole of the fifth cervical vertebra and small osteophyte in the inferior tip of the sixth cervical vertebra, similar to Dr. Haddad's x-rays, which findings were consistent with the normal area for arthritis.
The testimony of plaintiff's lay witnesses is to the effect that they see her frequently and have noticed a difference between her physical condition before and after the accident. She often complains of pain in the neck and requires help with her housework and school assignments. Her principal described her as a very conscientious teacher who, prior to her injuries, had spent a great deal of additional time in the classroom helping pupils in her specialty of teaching, reading conditioning. Her pupils are children with reading problems and there are a maximum of eight pupils in her classes. During the period of her absence these classes were suspended because there was no teacher qualified to replace her. Usually she went to various parts of the building to meet her classes but after the accident, and because of the pain she experienced, she was permitted to remain upstairs all day and was assisted in her work by the other teachers.
Now, addressing ourselves to appellants' contentions, we reject the argument that the force of the collision impact was so slight it could not have caused the injuries of which plaintiff complains. It is true that the force of the impact was slight. The only damage to the plaintiff automobile was to the rear bumper, a part of which was pushed forward towards the body of the car, and plaintiff's suit does not include any claim for property damages. But the record establishes to our complete satisfaction that there was a collision in which plaintiff was injured. The minimal force of the collision is of no material importance as the same relates to the extent of the injury. We are in agreement with our learned brothers of the Second Circuit who stated in Seegers v. State Farm Mutual Automobile *917 Ins. Co., La.App., 188 So.2d 166, 167, that the degree of the injuries sustained in a collision cannot be measured by the minimal force of the collision.
Defendants' argument relative to plaintiff's failure to call two of her examining physicians, with a resulting presumption that their testimony would have been unfavorable to her, has reference to Dr. Miller, a physician for the Orleans Parish School Board, and Dr. Richardson, a neurosurgeon.
The record establishes that in the Parish of Orleans teachers who have been absent for an extended period report to the school board physician prior to their return to work in order to determine whether or not they are able to resume their duties. The record also establishes that plaintiff missed 51 calendar (or 38 school) days and returned to work after that time with the approval of Dr. Miller. Since Dr. Miller was not plaintiff's physician and since plaintiff has made no claim that she was unable to work subsequent to the time she returned to teaching, we are unable to see how Dr. Miller's testimony could have been unfavorable to the plaintiff beyond establishing that she was able to return to work at the time he examined her.
Plaintiff was referred to Dr. Richardson by Dr. Haddad for a neurological examination. Although Dr. Richardson did not testify, it is clear from the testimony of Dr. Haddad, a plaintiff witness, that the former found no neurological reason for plaintiff's complaints and was of the opinion that those complaints were psychoneurotic. While the competency of a neurosurgeon to express an opinion in the field of psychoneurosis may be questioned, Dr. Richardson's opinion was before the court and the defendants were not prejudiced by plaintiff's failure to call him as a witness, especially in view of the fact that the award for plaintiff's injuries is not based upon psychoneurosis.
Defendants' contention that the award for special damages is excessive is based on the argument that one of the items included in that award, $1,220.56 for loss of wages, should not have been allowed. The record establishes that plaintiff missed 38 school days as a result of her injuries and $1,220.56 is the amount she receives in wages for that period of time. However, the record also establishes that the plaintiff actually received her wages for the 38 days in question because of accumulated sick leave. Defendants therefore argue she has lost nothing on account of her inability to work the 38 school days. We do not agree with the argument.
According to the testimony of Mr. Alfred Hebeisen, personnel director of the school board, a teacher is entitled to 10 days for each year of service for sick leave to cover emergency illness. The time is permitted to accumulate and if it is unused the teacher has the option of using the accumulated time for her own purposes. Plaintiff had been employed by the school board for 34 years and her sick leave had accumulated until at the time of the accident she had sufficient time coming to her to carry her over the entire period of her 38-day absence. However, should she become sick after this time, 38 days of her sick leave would have been used up and she would be unable to exercise her option of taking 38 days off. As the concept of sick leave is not intended to benefit a tort feasor, defendants cannot benefit by, or receive credit for, the accumulated time plaintiff has acquired and thus deprive her of the time she has earned. Where it has been shown, and such a showing has been made in this case, that salary payments made to the injured party by his employer during the incapacity occasioned by the injury result in a loss of accumulated sick or vacation leave benefits, the tort feasor is not entitled to credit therefor against a claim for lost earnings. Hudgens v. Mayeaux, La.App., 143 So.2d 606; Chandler v. F. Strauss & Son, La.App., 194 So. 133.
*918 With regard to quantum for personal injuries, it is now well established that each case must be decided largely on the facts and circumstances surrounding the particular injuries involved and that amounts of awards in similar cases are relevant for the exclusive purpose of determining whether the award is so excessive or so inadequate as to constitute an abuse of the "much discretion" vested in the trial court. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127.
In this connection we have examined other cases involving somewhat similar injuries. These cases include: Dupuy v. Southern Farm Bureau Casualty Ins. Co., La.App., 212 So.2d 484; Zager v. Allstate Insurance Company, La.App., 211 So.2d 744; Harris v. Travelers Insurance Company, La.App., 207 So.2d 891; Manning v. Herrin Transportation Company, La.App., 201 So.2d 314; Mouton v. Continental Insurance Company, La.App., 196 So.2d 684; Williams v. Bologna Brothers, Inc., La. App., 194 So.2d 131; Poleman v. Employers Liability Assurance Corp., La.App., 164 So. 2d 630.
We find that Simpson v. Alexander, La. App., 195 So.2d 457, the case upon which plaintiff principally relies, is not appropos. In that case the plaintiff had severe whiplash-type injuries requiring a bone graft operation, was permanently affected in his job as a travelling salesman and suffered permanent residual disabilities, injuries much more severe than those involved in the instant case.
Here we are unable to find that the plaintiff suffers any residual disability as a result of the accident. Although her recovery has been protracted because of a prior existing arthritic condition, even according to her own treating physician should her disability continue beyond two and one-half years it would be attributable to her degenerative arthritis unconnected with the accident.
We find that plaintiff sustained a moderate to severe cervical strain extending over a period slightly in excess of two years during which time she suffered considerable pain and discomfort. While she failed to respond to treatment as quickly as would ordinarily be anticipated, after one year she did show marked improvement. We conclude that the award to her in the amount of $10,000 for pain and suffering is excessive to the extent that it constitutes an abuse of the "much discretion" vested in the trial court, and, accordingly, we will reduce that award to the sum of $6,000.
For the reasons assigned, the judgment appealed from is amended only to the extent of reducing the award for pain and suffering in favor of plaintiff from the sum of $10,000 to the sum of $6,000. As thus amended, and in all other respects, the judgment appealed from is affirmed; costs of this appeal to be paid by the plaintiff-appellee.
Amended and affirmed.